Filed 3/27/26  P. v. McCoy CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY McCOY,<br><br>        Defendant and Appellant. | A169353<br><br><br>(Contra Costa County Super. Ct. No. 04-23-00280) |

Anthony McCoy appeals from his convictions for first degree murder (Pen. Code, § 187, subd. (a))[1] and conspiracy to commit murder (§ 182, subd. (a)(1)).  He contends that the trial court erred in denying his motion for an evidentiary hearing to challenge the veracity of a police probable cause affidavit under *Franks v. Delaware* (1978) 438 U.S. 154 (*Franks*).  He also challenges the court's denial of his motions for a mistrial and a new trial after the deliberating jury was mistakenly provided with an exhibit that was never admitted into evidence.  And he asserts that his sentence must be corrected pursuant to section 654.  We agree that his sentence must be corrected, but we otherwise affirm the judgment.

---

[1] Undesignated statutory references are to the Penal Code.

1

# BACKGROUND

## A.

### 1.

At 11:49 p.m. on September 4, 2022, the 17-year-old murder victim, Anthony Westbrook, Jr., was gunned down in a drive-by shooting in front of his grandmother's house. The shooter fired out of the rear passenger window of the car. At the scene, a shell casing from a .40-caliber round, stamped "CCINR 40, S and W," was recovered from the street.

The victim's father, Anthony Westbrook, Sr., witnessed the shooting from the front porch of the house. The victim's identical twin brother was also nearby at the time.

Minutes after Westbrook, Jr. was pronounced dead at the scene, Detective Kristian Palma spoke with his father. Westbrook, Sr. stated that the car was a "black or dark colored Infinity four-door or import-type sedan," and that the shooter was seated in the right rear passenger seat and was armed with a handgun. Westbrook, Sr. described hearing approximately six gunshots.

Just before 3:00 a.m., another detective, Adam Duffy, talked to Westbrook, Sr. on the front porch. Westbrook, Sr. told Duffy that he was sitting on the porch when his son was shot. A dark-colored, possibly red, sedan pulled onto their street and the rear passenger fired several gunshots out of the car window. Westbrook, Sr. related that the shooter was not wearing a mask, was a teenage male, and was possibly black or Hispanic.

A few days later, in a discursive follow-up meeting with Detective Robert Gerber on September 8, 2022, Westbrook, Sr. related additional details from the shooting. During the meeting, Westbrook, Sr. referenced home security camera videos and social media, and he provided a more detailed description of the

shooter. He indicated that after he described the shooter's appearance, others had shown him a photograph of McCoy, and that he believed McCoy was the person who had shot his son. Based on Westbrook, Sr.'s statements, the police obtained search warrants focused on McCoy, enabling them to obtain his cell phone and social media records and search his car.

2.

In the ensuing investigation, the police connected McCoy to the shooting and developed a theory that he targeted Westbrook, Jr. due to a gang rivalry. Police believed that Westbrook, Jr. and his brother, who were commonly known as "the twins," were members of the MidTown gang. The Bully Boyz, with whom McCoy was associated, were MidTown's main rival. The twins' grandmother's house was a common gathering spot for the MidTown gang.

After reviewing security camera videos from neighboring properties and photos and license plate information captured by an automated license place reader system, the police tracked a red Nissan Altima matching the description of the suspect vehicle and observed McCoy driving it. Although the rims on McCoy's Altima did not match the rims on the car in the security videos from the night of the shooting, an automated license plate reader had photographed McCoy's car on September 8, 2022, sporting the same rims as the suspect vehicle. The police determined from later photographs that the rims on McCoy's car had been changed in mid-October 2022.

Cell phone records placed McCoy's phone at the location of the shooting. On the night of September 4, 2022, McCoy's phone was located in the vicinity of the twins' grandmother's house at 10:29 p.m., before leaving the area. Between 11:35 and 11:47 p.m., McCoy's phone was moving back toward the grandmother's house. At 11:51 p.m., immediately after the shooting, McCoy's phone used the cell tower covering the grandmother's street

3

address. The phone then quickly moved away from the scene of the crime toward McCoy's home. In mid-September, McCoy recycled a cell phone at a Walmart.

In the days before the September 4th shooting, McCoy's Instagram account, "fullyautoant," exchanged messages with members of the Bully Boyz gang, discussing finding rivals to kill and referencing firearms and ammunition. On September 2, McCoy's associate sent a message to a group including McCoy's account that asked why "the twins" were always running from Bully Boyz members; McCoy's account responded "N words[2] always running." McCoy's associate then messaged that the twins were at "granny's house." Later that night, McCoy's account sent messages to the group about arming and going into rival territory to do a shooting.

In a search of McCoy's Altima, police discovered two spent .40-caliber cartridge casings, one of which contained a "CCINR 40, S and W" headstamp. At McCoy's residence, police found an empty Glock pistol magazine, ten .40-caliber live ammunition cartridges, and a full auto selector switch for a Glock pistol. Police did not find the firearms referenced in McCoy's messaging history.

**3.**

In his defense, McCoy presented testimony that, to enhance their reputations, gang members sometimes take credit for crimes they did not commit. McCoy also presented expert testimony that DNA obtained from a .40-caliber casing recovered from the scene was not sufficient to conduct a comparison with a suspect's DNA profile.

---

[2] During the trial, the phrase "N words" was used as a substitute to avoid repeating a racial epithet.

McCoy's fiancée provided an alibi.  She testified that, on the night of September 4, 2022, she called McCoy at 10:47 p.m. and 11:21 p.m., but he did not answer.  Each time, McCoy's "phone had hung up."  It was unusual for McCoy to hang up on her.  Concerned, she went to McCoy's residence.  When she arrived at 11:30 p.m., McCoy was at home.  He seemed "spooked" and "fidgety," and she did not see him with his cell phone.  McCoy went out around midnight to walk his dog.  When he returned, he had his cell phone with him but he still seemed "fidgety . . . , nervous[,] and scared."  McCoy kept his phone unlocked all the time.  McCoy's fiancée did not tell anyone that he was at home the night of the shooting until the night before she testified, when she shared the information with his defense attorney for the first time.  Because she had attended the entire trial up until that point, she was familiar with the prosecution's case against McCoy, including all of the cell phone location evidence.  She did not share her account earlier because she was afraid for her safety and that of her child.

The defense argued that McCoy was a "dupe[]" who was set up by Bully Boyz members who took his phone and car to commit the crime while he was at home.  Further, McCoy's social media statements were not genuine but instead were "all talk."

**B.**

In the trial court, McCoy unsuccessfully sought an evidentiary hearing under *Franks*, arguing that the probable cause affidavit made in support of the search warrants included false statements concerning the information Westbrook, Sr. provided to police.  The court concluded that McCoy had made an insufficient showing that the statements in the affidavit were false or in reckless disregard of the truth.

During deliberations, the jury inadvertently received Exhibit 116 even though it had not been admitted into evidence. Exhibit 116 contained social media records from the Instagram

5

account of an alleged member of Bully Boyz; one page of the exhibit provided to the jury contained a handwritten note that read, "Δ sends murder scene video." After questioning the jury about their exposure to the exhibit, the court denied McCoy's motion for a mistrial. The court instructed the jury to disregard the exhibit, replaced one juror[3] with an alternate, and directed the jurors to begin deliberations anew.

After the jury found McCoy guilty of first degree murder (§ 187, subd. (a); count one) and conspiracy to commit murder (§ 182, subd. (a)(1); count two), the trial court denied McCoy's motion for a new trial. The court sentenced him to two concurrent terms of 25 years to life in prison.

## DISCUSSION

### A.

McCoy argues that the trial court erred in declining to hold an evidentiary hearing under *Franks* based on his showing that statements in the probable cause affidavit were deliberately false or made with reckless disregard of the truth. Reviewing the issue de novo (*People v. Panah* (2005) 35 Cal.4th 395, 457 (*Panah*)), we disagree.

Under *Franks*, a defendant may seek an evidentiary hearing to challenge the truthfulness of statements contained in an affidavit of probable cause made in support of a search warrant. (See *Panah, supra,* 35 Cal.4th at p. 456; *Franks, supra,* 438 U.S. at pp. 155-156.) To obtain an evidentiary hearing, the defendant must first make a substantial showing that (1) statements in the affidavit are "deliberately false or were made in reckless disregard of the truth"; and (2) once the false

---

[3] Before the court had a chance to excuse the juror, the court learned that the jury had reached a verdict. However, in light of the circumstances, the court informed the jury that it could not accept the verdict with the jury so constituted.

6

statements are omitted, the remainder of the affidavit is insufficient to establish probable cause. (*Panah*, at p. 456.) Merely negligent misrepresentations are inadequate. (*Ibid.*) Here, McCoy's showing fails at the first step.

McCoy argues that Detective Gerber falsely represented that Westbrook, Sr. was able to recall the physical characteristics of the shooter during the September 8, 2022 interview, when in fact he was describing details he gathered by conducting an investigation on social media and watching security camera video footage. Specifically, Gerber related statements from Westbrook, Sr. that the shooter had leaned out of the car window and that the shooter was light-skinned with dark, curly hair, a straight-cut hairline, and a narrow face. According to McCoy, the affidavit created the false impression that Westbrook, Sr. subsequently remembered these details from the night of the shooting. McCoy further asserts that Westbrook, Sr.'s earlier statements to Detectives Palma and Duffy—given the night of the shooting—establish that he was simply unable to provide a detailed description of the shooter.

Our review of the audio recording of the September 8, 2022 interview, along with the evidence of Westbrook, Sr.'s statements on the night of the shooting, does not support McCoy's contentions.

Although Westbrook, Sr. mentioned Instagram photos and security camera videos during the September 8 interview, he never indicated that his physical description of the shooter was based on such sources. Instead, his statements suggested that his description was based on his own first person observation of the shooter. At the start of the interview, he told police that *after* he "told the kids . . . how [the shooter] looked, . . . the first person they showed me, . . . that's him, . . . Anthony McCoy." Westbrook, Sr. then told the police: "That person I seen, that shot my son, [that's] . . . Anthony McCoy." Subsequently, Westbrook, Sr.

7

provided a more detailed physical description after the police said to him, "You've had some time to think about it.  Is there any other details [*sic*] you've thought of since then you can share?"  Westbrook, Sr. then responded that the gunman was a "light skinned brother" with "a long face," "a straight cut hair line," and "black hair that's curly."  He made clear that the shooter's face had been visible, explaining that the shooter leaned "out the car" and commenting, "[w]hoever's leading these little kids to do this shit are not telling 'em you oughtta have a mask on, young buck!"  Later, he asked the police if they heard in the security camera video that there were four "pop[s]," and he told them that for the last "pop . . . I was staring him in the face."  Near the end of the recording, the police asked Westbrook, Sr. "how sure are you" about his account, and he responded, "I'm so sure, a hundred percent sure . . . I'm so sure, it's to where . . . when I was telling . . . when I was describing him, the first person . . . when they showed that picture, I said that's him!"  Westbrook, Sr. confirmed that the shooter was not wearing a mask or hat, saying he was wearing "nothing, no mask, no hat, no nothing.  He was straight fucking bare-faced."  McCoy has not made a substantial showing that Gerber's statements in the affidavit—that Westbrook, Sr. had "remembered" the foregoing details—falsely represented the interview.

Nor has he made a substantial showing that the affidavit recklessly disregarded the truth.  McCoy argues that police should have known that Westbrook, Sr.'s subsequent description was fabricated because he did not share the same details on the night of the shooting.  McCoy's argument is based on the erroneous premise that Westbrook, Sr.'s statements on the night of the shooting comprehensively related to the police every detail about the shooting that he perceived.  That premise is not supported by the record.

8

Although Westbrook, Sr. volunteered some information the night of the shooting, he did not give an extensive police interview at the time. Westbrook, Sr. spoke with Detective Palma minutes after his son was pronounced dead. While speaking with Palma, Westbrook, Sr. was "emotionally upset" and had "spells of crying, spells of . . . yelling" and "grieving." Westbrook, Sr. told Palma that the gunman was in the right rear passenger seat and was armed with a handgun, but did not describe any physical characteristics. Palma did not ask Westbrook, Sr. follow-up questions to attempt to elicit further details of the shooter's physical description and never asked whether he was able to see the shooter's gender or race. Similarly, when Detective Duffy spoke to Westbrook, Sr. at 2:43 a.m., Westbrook, Sr. was, understandably, still "shocked" and "emotional." At that point, a little over two and a half hours after he spoke with Palma, Westbrook, Sr. was able to relate additional details, including that the shooter was not wearing a mask, was a teenaged male, and was "possibly black or Hispanic."[4] Westbrook, Sr. never indicated that he was unable to recall or provide additional details, nor was there evidence that Palma or Duffy pressed him for a more specific description.

Given Westbrook, Sr.'s emotional state, the informality and length of the interviews, and the fact that the police did not question him in detail, the limited description he shared in the minutes and hours immediately following his son's violent murder does not support a conclusion that his later, more detailed statements were false. (Cf. *People v. Scott* (1963) 218 Cal.App.2d 249, 255 ["It is settled that a witness may not be impeached by showing that he omitted a fact or stated it less

---

[4] McCoy does not argue that these additional details were unlikely to be true because Westbrook, Sr. did not share them in his initial interview with Palma.

fully at a prior proceeding unless his attention was called to it at that time"].)

## B.

McCoy contends that the trial court abused its discretion in denying his motion for a mistrial after members of the jury reviewed inadmissible evidence in the form of records from the Instagram account of an alleged Bully Boyz member Tejean Hornbeak (Exhibit 116). We discern no abuse of discretion.

## 1.

The court discovered the problem when, during deliberations, the jury foreperson sent a note that read: "Are we supposed to have Exhibit 116? There is a sticky note with odd note [*sic*]." After conferring with counsel, the court sent the following response to the jury: "No. Do not consider anything from Exhibit 116 and do not discuss it."

The next morning, the court discussed Exhibit 116 with counsel, identifying the exhibit as "the Meta Platform records of the . . . Instagram account" belonging to Tejean Hornbeak. The exhibit contained a string of metadata and message threads between Hornbeak, McCoy, and other alleged co-conspirators. One page of Exhibit 116 had affixed to it a handwritten "sticky note" stating "Δ sends murder scene video," presumably referring to the defendant. The note was placed next to text in the exhibit indicating that on September 8, 2022, four days after the murder, McCoy's Instagram account, "fullyautoant[,] sent a video." Because the court had ruled Exhibit 116 inadmissible, it was never admitted into evidence, so the court found that "it went into the jury by error."

The court questioned the members of the jury about their exposure to Exhibit 116. The foreperson informed the court that "two of us had glanced through some of it, but there was no group discussions about it." Other than the foreperson, the only juror

10

who had looked at Exhibit 116 was Juror No. 1, who stated that she "just briefed through it" and "mainly saw the sticky note." When asked whether there was any discussion about the contents of the exhibit, the foreperson responded, "No."

The court then instructed the jury: "I'm going to send you back to deliberate. And I want anyone who leafed through, looked at, whatever, referenced Exhibit 116, you are to completely disregard it. . . . [I]t is not to be considered by you in your deliberations at all. I don't want any reference to it; nothing. Can you all agree to that?" All of the jurors said "[y]es" except for Juror No. 1, who did not respond or otherwise indicate their assent. Out of the presence of the jury, defense counsel stated, "I'm unsatisfied by that response by" Juror No. 1, adding "[t]he others clearly were okay, but the one that was at least tangentially involved did not give that assurance."

The court replaced Juror No. 1 with an alternate and instructed the jury to begin deliberations anew, but it declined to grant a mistrial or new trial.

**2.**

McCoy argues that the trial court should have granted his motions for mistrial and for a new trial because the jurors' exposure to the statement "Δ sends murder scene video" could not be cured by the court's admonition. He asserts that the note amounted to a confession that he committed the murder. We are unpersuaded.

The trial court must grant a mistrial in the event of a prejudicial incident that cannot be cured by admonition or instruction. (*People v. Edwards* (2013) 57 Cal.4th 658, 703.) The question is whether the defendant's ability to receive a fair trial has been irremediably damaged. (*Ibid*.) Because whether a particular occurrence is " ' "incurably prejudicial" ' " is necessarily speculative, the trial court has " ' "considerable discretion" ' "

11

when deciding a mistrial motion.  (*Ibid*.)  As for a new trial motion, the trial court may grant relief only where the defendant has demonstrated reversible error.  (*People v. Clair* (1992) 2 Cal.4th 629, 667.)  On appeal, we review the denial of a new trial for abuse of discretion.  (*Id.* at p. 667.)

In conducting our review, we presume that the jury followed the court's instruction to disregard Exhibit 116, particularly where, as here, the remaining members of the jury affirmatively agreed to do so.  (See *People v. Turner* (2021) 73 Cal.App.5th 117, 128.)  The jury's exposure to improper evidence "can almost always" be cured by an appropriate instruction or admonition (*People v. Navarrete* (2010) 181 Cal.App.4th 828, 836 (*Navarrete*)), such as where the exposure was "brief, isolated, or ambiguous."  (*Turner*, at p. 129).  There may be " 'exceptional circumstances' " in which a curative instruction is inadequate, however.  (*Id.* at p. 128.)

For example, courts have deemed curable any prejudice where a witness volunteered that the defendant was being retried after an earlier conviction was reversed (*People v. Ledesma* (2006) 39 Cal.4th 641, 683), and when a witness referenced the defendant's recent imprisonment (*People v. Avila* (2006) 38 Cal.4th 491, 574; *People v. Valdez* (2004) 32 Cal.4th 73, 124-125).  In *Navarrete*, by contrast, the court held that the prejudice could not be cured by an instruction where a police witness improperly gave testimony suggesting that the defendant had confessed to the charged crime, committing a lewd act upon a child.  (*Navarrete, supra,* 181 Cal.App.4th at pp. 829, 834-837.) *Navarrete* reasoned that a "jury's belief that a defendant may have confessed eviscerates the presumption of innocence," and "jurors cannot be expected to wipe from their minds knowledge that a [defendant] has confessed even when a trial court instructs them to do so."  (*Id.* at pp. 834-835.)

McCoy contends that his case is like *Navarrete*, asserting that the statement that he sent a murder scene video amounts to a confession. We disagree that, in the circumstances here, a jury's knowledge that the defendant sent a murder scene video has the same effect as a jury's knowledge that a defendant confessed to the crime. Neither possession nor transmission of a video of a crime scene that took place on a public street means that the possessor or sender filmed or appeared in the video, let alone committed the crime. Indeed, there may be multiple innocent explanations for how a person could come into possession of a video of the scene. For example, the defendant might have received the video from someone else through social media or text message, and then forwarded it to others via Instagram. Here, the jury heard evidence that McCoy was active on social media and posted both photos and videos in his Instagram account. The jury also received evidence that multiple home security cameras in the vicinity recorded events from the night of the shooting, including the shooting itself and audio from the shooting. McCoy does not explain how sending a video of the crime scene on social media implicates him as the shooter. Because the statement "Δ sends murder scene video" is at best ambiguous and does not inculpate McCoy as the perpetrator, the trial court did not abuse its discretion in denying the motion for mistrial, excusing one juror, and admonishing the jury. For the same reason, the trial court's denial of the motion for a new trial was within its discretion.

## C.

Finally, the parties agree that under section 654, the trial court erred in imposing two concurrent sentences of 25 years to life in prison for first-degree murder (count one) and conspiracy to commit murder (count two). We agree that McCoy's sentence on count two must be stayed.

13

Section 654, subdivision (a), provides: "An act or omission that is punishable in different ways by different provisions of law may be punished under *either* of such provisions, but in no case shall the act or omission be punished under more than one provision." (Italics added.) Under section 654, a criminal defendant may not receive more than one punishment for a single act, nor may a defendant receive multiple punishments for acts that comprised a single, indivisible course of conduct in service of a single objective. (*People v. Perez* (1979) 23 Cal.3d 545, 550-552.) As a result, section 654 prohibits punishing a defendant for both conspiracy to commit murder *and* the underlying murder. (*People v. Hernandez* (2003) 30 Cal.4th 835, 866, disapproved of on another ground by *People v. Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32.)

Here, the trial court recognized that count two, "the conspiracy charge[,] is based on the exact same conduct as found to be true in [c]ount [one]," the murder charge. The court properly concluded: "under . . . [s]ection 654, I cannot punish separately on [c]ount [two]." However, in pronouncing McCoy's sentence, the court did not stay the sentence on count two, which was necessary to avoid double punishment. (*See People v. Caparaz* (2022) 80 Cal.App.5th 669, 689.)

Where, as here, the punishment is the same for the two counts at issue, a remand is unnecessary because it would not change the defendant's sentence. (*People v. Bey* (2025) 108 Cal.App.5th 144, 167.) Accordingly, we will modify the judgment to stay the sentence for count two. (*See ibid.*)

## DISPOSITION

Pursuant to section 654, the judgment is modified to stay the sentence on count two. The trial court is directed to prepare an amended abstract of judgment reflecting this modification and to forward a certified copy to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

14

BURNS, J.

WE CONCUR:

SIMONS, ACTING P. J.
CHOU, J.

*People v. McCoy* (A169353)